**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**JESSIE DANIEL,**

    **Plaintiff,**

-vs-                 Case No. 6:05-cv-1163-Orl-KRS

**COMMISSIONER OF SOCIAL SECURITY,**

    **Defendant.**

_____

**ORDER**

  This cause came on for consideration without oral argument on the Complaint filed by Jessie James Daniel, seeking review of the final decision of the Commissioner of Social Security denying his claim for social security benefits. Doc. No. 1. The Commissioner answered the Complaint and filed a certified copy of the record before the Social Security Administration (SSA). Doc. Nos. 6-7. Pursuant to the consent of the parties, this matter has been referred to me for disposition under 28 U.S.C. § 636(c). Doc. Nos. 9-10.

**I. PROCEDURAL HISTORY.**

  In September 2002, Daniel applied for disability benefits under the Supplemental Security Income for the Aged, Blind and Disabled Program (SSI), 42 U.S.C. § 1381, *et seq*. (sometimes referred to herein as the Act). R. 50-64. Daniel alleges that he became disabled on September 3, 2002. *Id*. Daniel's application was denied initially and on reconsideration. R. 29-33, 37-39, 43-44.

Daniel made a timely request for a hearing before an administrative law judge (ALJ).  R. 36.  An ALJ held a hearing on September 29, 2004.  Daniel, represented by a person who was not an attorney, testified at the hearing.  No other testimony was taken.  R. 353-67.

After considering the testimony and the medical evidence presented, the ALJ found that Daniel had not engaged in substantial gainful activity since September 3, 2002, the alleged onset date of his disability. R. 19.

The ALJ concluded that the medical evidence showed that Daniel had chronic pancreatitis, meningitis, hypertension, and history of alcohol abuse, which were severe impairments.  These impairments did not meet or equal any of the impairments listed in the applicable social security regulations (the Listings).[1]  R. 19.

The ALJ found that Daniel had the residual functional capacity (RFC) to perform the following: lift and carry up to fifty pounds occasionally and twenty-five pounds frequently; and stand, walk, and sit for six hours in an eight-hour workday.  R. 17.  This correlated to a finding that Daniel could perform medium work.[2]  *Id*.   The ALJ did not impose any additional limitations on this RFC.  *Id*.

With respect to limitations arising from nonexertional impairments, including pain, the ALJ concluded that Daniel "overstate[d] his limitations in concluding he is debilitated to the point

---

[1] The Code of Federal Regulations "contains a Listing of Impairments specifying almost every sort of medical problem ('impairment') from which a person can suffer, sorted into general categories." *Shinn ex rel. Shinn v. Comm'r of Soc. Sec.*, 391 F.3d 1276, 1278 (11th Cir. 2004); 20 C.F.R. Part 404, Subpt. P, App. 1.

[2] "Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. If someone can do medium work, we determine that he or she can also do sedentary and light work." 20 C.F.R. § 416.967(c).

of being unable to engage in medium, light, or sedentary work." *Id.* The ALJ concluded that while Daniel experienced pain from pancreatitis he was able to do "a little bit around the house (e.g., picks up papers, reads newspapers, spends time with his live-in grandchildren, and occasionally visits)." *Id.* The record did not reflect that Daniel had a condition causing a weakness of his right hand. He had not required ongoing physical therapy or a pain management specialist. He had no particular problems with hearing, speaking, seeing, reasoning or using his extremities. R. 17-18. Moreover, "recent physical examinations have revealed no serious physical deficits." R. 18. The ALJ also noted that Daniel's assertions that he had stopped drinking were questionable. R. 17.

Because Daniel's past relevant work required more than a medium level of exertion, and "giv[ing] [Daniel] the benefit of the doubt," the ALJ concluded that Daniel could not return to his past relevant work. R. 18.[3] Considering the Medical-Vocational Guidelines (the Grids), 20 C.F.R. Pt. 404, Subpt P, App. 2, the ALJ concluded that Daniel could "perform the demands of a broad range of medium work." R. 19. Therefore, the ALJ concluded that Daniel was not disabled. R. 19A.[4]

---

[3] The ALJ noted that Daniel's past employment as an environmental service worker required medium exertion as performed. R. 18. It is unclear why the ALJ found that Daniel could not perform this work in light of the finding that Daniel could perform a full range of work at the medium level of exertion.

[4] The record intermittently contains pages denominated __A. The "A" pages immediately follow the preceding number.

Daniel requested review of the ALJ's decision. R. 10.  On June 3, 2005, the Appeals Council issued a decision finding no basis to review the ALJ's decision.  R. 5-7.  Daniel timely sought review by this Court.  Doc. No. 1.

**II.    JURISDICTION.**

The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied Daniel's request for review.  *See Falge v. Apfel*, 150 F.3d 1320, 1322 (11th Cir. 1998); 20 C.F.R. § 416.1481.  Therefore, the Court has jurisdiction pursuant to 42 U.S.C. § 405(g), as adopted by reference in 42 U.S.C. § 1383(c)(3).

**III.   STATEMENT OF FACTS.**

*A.    Daniel's Testimony and Written Statements.*

Daniel was born February 20, 1952. R. 355-56.  He is 5'6" tall and weighed approximately 135 pounds at the time of the hearing.  R. 356.  He attended school through the ninth grade and did not receive a GED or subsequent vocational training.  *Id.*

Daniel has previously worked as an environmental services technician for a hospital, a shipping and receiving clerk, a laborer, and a mechanic.  R. 356-57.  As an environmental services technician, Daniel performed janitorial services that required walking and standing for up to six-and-a-half hours per day, kneeling for six hours per day, and sitting for thirty minutes per day.  R. 88.  He lifted up to twenty-five pounds frequently.  *Id.*  As a shipping and receiving clerk he loaded and unloaded trucks.  In this position, he stood, walked, stooped, kneeled, and handled objects for up to seven hours in an average day, and frequently lifted up to fifty pounds.  R. 89.  As a laborer he mixed and carried cement blocks.  He walked or stood for up to eight hours in an

average days and frequently lifted up to fifty pounds. R. 90. As a mechanic, he performed basic automobile maintenance. R. 63, 67. He occasionally lifted up to one hundred pounds and frequently lifted up to fifty pounds. R. 67.

Daniel's most severe condition was pancreatitis-related stomach pain.[5] R. 357A. The pain worsened as he moved around, or when he tried to work or perform chores. R. 357A-58. It was a sharp pain that never completely went away. R. 357A, 359. He woke with pain about three times per week. R. 74. The pain became worse when eating certain foods. R. 80. It often required emergency room treatment. *Id*.

Daniel could stand for no more than about fifteen minutes at a time because he experienced weakness and pain. R. 358. He could sit for about twenty minutes before having to change positions because of pain. *Id*. He estimated he could walk about half a block before needing to take a break because of pain. R. 364. He also experienced shortness of breath when walking. R. 74, 95. Daniel had problems climbing stairs or ramps because of dizziness. R. 359-60. Kneeling, crouching, and bending all caused pain. R. 360. He had trouble putting on shoes because it required bending. R. 97.

Daniel also had problems with right (dominant) hand weakness. R. 41, 95, 360. Therefore, he used both hands to lift things. R. 360. Daniel estimated that he could lift no more

---

[5] Pancreatitis involves inflammation of the pancreas. Chronic pancreatitis occurs when digestive enzymes attack and destroy the pancreas and nearby tissues, causing scarring and pain. Symptoms include abdominal pain, nausea, vomiting, weight loss, and fatty stools. *See* National Institute of Diabetes and Digestive and Kidney Diseases, *Pancreatitis*, http://digestive.niddk.nih.gov/ddiseases/pubs/pancreatitis/ (last visited Oct. 13, 2006).

than ten pounds.  R. 358.  He also experienced pain when pushing or pulling with his arms.  R. 359.

Daniel had hypertension and had been prescribed Norvasc.[6]  R. 361-62.  He had also been prescribed hydrocodone[7] and Percocet[8] for pain.  R. 362.  Family and friends contributed support so that he could purchase his medication.  *Id*.

Daniel also had trouble reading fine print.  R. 361.  He had discomfort associated with cold weather, fumes, and dust.  *Id*.

In a normal day, Daniel picked up around the house, read, watched television, and interacted with his grandchildren.  R. 365.  He rarely went out, but he did visit with family and friends.  R. 81-82, 365-66; *but see* R. 97 (indicating in February 2003 that he did not visit with family and friends).  He ate boiled vegetables and simple foods.  R. 81.  Daniel testified he had not used alcohol in the last five years.  R. 357A.  He required help from family to lift laundry.  R. 81.  His girlfriend assisted him with shopping.  R. 81.  He could drive but did not like to do so because of stomach pain.  R. 82, 103; *see also* R. 83-84 (statement by Daniel's niece).  Pain interfered with his sleep.  R. 81.

---

[6] Norvasc is the brand name for amlodipine, a calcium channel blocker used in the treatment of hypertension and angina.  Medline Plus, *Amlodipine*, http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a692044.html (last visited Oct.13, 2006).

[7] Hydrocodone is a "potent analgesic derivative of codeine."  It is a narcotic.  STEDMAN'S MEDICAL DICTIONARY 816 (26th ed. 1995) (STEDMAN'S).

[8] Percocet is the brand name for a combination of oxycodone, a narcotic analgesic derivative of codeine, and acetaminophen, an NSAID.  It is prescribed for moderate to moderately severe pain. Drugs.com, *Percocet*, http://www.drugs.com/percocet.html  (last visited Oct. 13, 2006).

*B.     Medical Records.*

There are numerous emergency room treatment and hospitalizations for abdominal pain secondary to pancreatitis.  R. 252-70 (October 4, 1999, to October 6, 1999, with complaints of ten pound weight loss in previous months), 182-83 (March 18, 2001), 231-51 (September 4, 2002, to September 6, 2002; CT scan showed changes consistent with chronic pancreatitis), 171-81 (October 6, 2002, rating pain as nine out of ten),  151-58 (November 19, 2002, rating pain as seven or ten out of ten), 141-47 (January 1, 2003, rating pain as between nine and ten out of ten), 135-38 (January 27, 2003, rating pain as between five and six out of ten), 211-22 (August 30, 2003, to September 2, 2003, rating pain as six or seven out of ten),132 (September 11, 2003), 125-27 (October 9, 2003, rating pain as eight out of ten), 118-20 (October 25, 2003, rating pain as seven out of ten), 278-82 (March 16, 2004, through March 17, 2004, rating pain as eight out of ten), 271-73 (August 19, 2004, rating pain as seven out of ten), 348-52 (September 14, 2004, rating pain as eight out of ten), 319-24 (November 28, 2004, rating pain as eight to ten out of ten), 313-18 (January 1, 2005, rating pain as ten out of ten), 306-12 (January 14, 2005, rating pain as eight out of ten), 287-302 (February 23, 2005, to February 24, 2005, rating pain as seven out of ten).  Daniel often indicated that the pain lasted a few days before he came to the hospital.  *E.g.*, R. 119 ("'[M]y pancreas started hurting' ~ 3 days ago."); 317 ("'Pancreas starting up' x 3 or 4 days.").

After these visits, Daniel was typically given prescriptions for various pain medications. R. 253, 270 (oxycontin, oxycodone – October 6, 1999),[9] 251 (Tylenol # 3 – September 4, 2002),[10] 172, 174 (Darvocet – October 6, 2002),[11] 153 (Vicodin – November 19, 2002),[12] 143 (Percocet – January 1, 2003), 136 (Demerol – January 27, 2003),[13] 128 (Percocet – September 7, 2003), 124 (Percocet – October 25, 2003), 272 (Vicodin – August 19, 2004).

Daniel was also advised to maintain a low fat and low cholesterol diet. R. 233. His weight remained relatively stable. R. 152 (140 pounds – November 19, 2002), 142 (150 pounds – January 1, 2003), 126 (145 pounds – October 9, 2003), 192 (132 pounds – November 18, 2003), 278 (140 pounds – March 16, 2004), 271 (140 pounds – August 19, 2004), 320 (140 pounds – November 28, 2004), 307 (140 pounds – January 14, 2005), 288 (140 pounds – February 24, 2005).

---

[9] Oxycodone is a narcotic analgesic derivative of codeine and is prescribed for the treatment of moderate to severe pain. Oxycontin is the brand name for an extended release form of oxycodone. Drugs.com, *OxyContin*, http://www.drugs.com/mtm/o/oxycontin.html (last visited Oct. 13, 2006).

[10] Tylenol # 3 is the brand name for a combination of acetaminophen and codeine. It is prescribed for the treatment of mild to moderate pain. Medline Plus, *Acetaminophen and Codeine*, http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a601005.html (last visited Oct. 13, 2006).

[11] Darvocet is the brand name for propoxyphene and is prescribed for the treatment of mild to moderate pain. Medline Plus, *Propoxyphene*, http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a682325.html (last visited Oct. 13, 2006).

[12] Vicodin is the brand name for a combination of acetaminophen and hydrocodone, a narcotic analgesic. It is prescribed for the treatment of moderate to severe pain. Drugs.com, *Vicodin*, http://www.drugs.com/mtm/v/vicodin.html (last visited Oct. 13, 2006).

[13] Demerol is the brand name for meperidine, a narcotic analgesic, and is prescribed for the treatment of moderate to severe pain. Medline Plus, *Meperidine*, http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a682117.html (last visited Oct. 13, 2006).

In January 2003, Alex C. Perdomo, M.D., saw Daniel at the request of the SSA. R. 107. Dr. Perdomo observed that Daniel had a history of abdominal pain due to chronic alcoholic pancreatitis. He had been hospitalized numerous times for acute exacerbations of pancreatitis. R. *Id*. Daniel reported he had been sober for three years. *Id*. On examination, Daniel's abdomen was "soft with mild to moderate diffuse upper abdominal tenderness." *Id*. There was no rebound, guarding, masses, or organomegaly. *Id*. Daniel had a full range of motion in the back, and normal grip strength and fine manipulation. R. 108. His blood pressure was elevated. R. 107-08. Dr. Perdomo's impression was history of chronic pancreatitis, alcohol abuse by history, and poorly controlled hypertension. R. 108. He opined that Daniel "had no functional limitations on physical examination today, although with his history of chronic abdominal pain, his job performance will likely be affected." *Id*.

In November 2003, Daniel was admitted to the hospital for headaches, mostly likely due to viral meningitis. R. 184-210, 283. Secondary diagnoses included cachexia[14] and hypertension. R. 184. He had nausea and vomiting. R. 185.

    C.    *Reviewing Professionals.*

In January 2003, Keith R. Holden, M.D., prepared a Physical Residual Functional Capacity Assessment at the request of SSA. R. 109-116. Dr. Holden concluded that Daniel could occasionally lift up to fifty pounds, frequently lift up to twenty-five pounds, and stand, walk, and sit for about six hours in an eight-hour workday. R. 110. He observed that Daniel had limited long distance visual acuity secondary to a refractive error. R. 112. He concluded that Daniel did

---

[14] "A general weight loss and wasting occurring in the course of a chronic disease or emotional disturbance." STEDMAN'S at 257.

not have any postural, manipulative, communicative, or environmental limitations.  R. 111-13.  He also opined that the "severity alleged [was] only partially credible based on: (1) infrequent bouts of true acute exacerbation of pancreatitis . . . [;] (2) no weight loss[;] (3) benign physical exam[;] (4) minimal anemia[; and] (5) [hypertension] is nonsevere . . . ."  R. 114.

## IV.     STANDARD OF REVIEW.

To be entitled to disability benefits under SSI, a claimant must be unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 1382c(a)(3)(A).  A "physical or mental impairment" under the terms of the Act is one "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. § 1382c(a)(3)(D).

Pursuant to 42 U.S.C. § 405(a), the SSA has promulgated a five-step inquiry that must be followed in determining whether a claimant is entitled to benefits.  In sum, an ALJ must apply the following criteria, in sequence:

>    (1) Is the claimant presently unemployed?
>
>    (2) Is the claimant's impairment severe?
>
>    (3) Does the claimant's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1?
>
>    (4) Is the claimant unable to perform his or her former occupation?
>
>    (5) Is the claimant unable to perform any other work within the economy?

20 C.F.R. § 416.920(a)(4). An affirmative answer to any of the above questions leads to either the next question, or, on steps three and five, to a finding of disability. A negative answer leads to a finding of "not disabled." *See, e.g., McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1987) (per curiam).

"The burden is primarily on the claimant to prove that he is disabled, and therefore entitled to receive Social Security disability benefits." *Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001) (citing 20 C.F.R. § 404.1512(a)). However, "the burden temporarily shifts at step five to the Commissioner[,] . . . [who] must produce evidence that there is other work available in significant numbers in the national economy that the claimant has the capacity to perform." *Id*. at 1278 n.2 (citing *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999)).

A court's review of a final decision by the SSA is limited to determining whether the ALJ's factual findings are supported by substantial evidence, *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005), and whether the ALJ applied the correct legal standards, *Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988).

The SSA's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g); *Dyer*, 395 F.3d at 1210. "Substantial evidence is more than a scintilla, and must do more than create a suspicion of the existence of the fact to be established. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Walden v. Schweiker*, 672 F.2d 835, 838-39 (11th Cir. 1982)(internal quotations omitted).

The court "must view the record as a whole, taking into account evidence favorable as well as unfavorable to the [SSA's] decision." *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986).

Where the SSA's decision is supported by substantial evidence, the court will affirm, even if the court finds that the proof preponderates against the decision. *Dyer*, 395 F.3d at 1210. The court may not reweigh the evidence or substitute its own judgment. *Id*.

While there is a presumption in favor of the SSA's findings of fact, no such presumption attaches to the ALJ's legal conclusion about the proper standards to be applied in evaluating claims. *Welch v. Bowen*, 854 F.2d 436, 438 (11th Cir. 1988). Therefore, the court will reverse if the SSA incorrectly applied the law, or if the decision fails to provide the court with sufficient reasoning to determine that the SSA properly applied the law. *Keeton v. Dep't of Health & Human Serv's*, 21 F.3d 1064, 1066 (11th Cir. 1994) (citing *Cornelius v. Sullivan*, 936 F.2d 1143, 1146 (11th Cir. 1991)).

When reviewing a final decision issued by the SSA, the court is authorized to "enter . . . a judgment affirming, modifying, or reversing the decision . . . with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

**V.     ANALYSIS.**

Daniel asserts two interrelated grounds supporting reversal. First, that the Commissioner erred in relying solely on the Grids. Second, that the ALJ improperly evaluated his subjective complaints of pain. These are the only issues I will address.[15]

*A.     Evaluation of Daniel's Pain and the Grids.*

Before the Grids were promulgated in 1979, the preferred method of determining whether there was work available that a social security claimant could perform was through the testimony

---

[15] The parties were advised that issues not specifically raised would be waived. Doc. No. 8.

of a vocational expert (VE). *See Cowart v. Schweiker*, 662 F.2d 731, 736 (11th Cir. 1981). After the United States Supreme Court approved use of the Grids in appropriate cases, *see Heckler v. Campbell*, 465 U.S. 458 (1983), three-judge panels in the Eleventh Circuit began to address whether the Grids could be relied upon at step five of the sequential evaluation process when the claimant had nonexertional impairments that limited his work skills.

The law that developed in this circuit requires that the ALJ initially determine whether the claimant's alleged nonexertional impairments limit the ability to work; if they do not, then exclusive reliance on the Grids at step five of the evaluation process is appropriate. *See Reeves v. Heckler*, 734 F.2d 519 (11th Cir. 1984)(citing *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 537 (6th Cir. 1981); *see also Broz v. Schweiker*, 677 F.2d 1351, 1363 (11th Cir. 1982)(remanding for consideration whether a claimant's nonexertional impairments significantly limited his basic work skills, and then, whether the Grids could be used), *vacated, Heckler v. Broz*, 461 U.S. 952 (1983), *adhered to on remand, Broz v. Schweiker*, 711 F.2d 957 (11th Cir.), *modified in other respects*, 721 F.2d 1292 (11th Cir. 1983). The ALJ's decision that nonexertional impairments do not significantly limit basic work skills (that is, do not preclude a wide range work at a given exertional level) must be supported by substantial evidence. *Foote v. Chater*, 67 F.3d 1553, 1559 (11th Cir. 1995).

"[I]n certain situations, pain alone can be disabling, even when its existence is unsupported by objective evidence. *Id.* at 1561 (citing *Marbury v. Sullivan*, 957 F.2d 837, 839 (11th Cir. 1992)). To evaluate allegations of pain, the ALJ must apply the pain standard. "The pain standard requires (1) evidence of an underlying medical condition and either (2) objective medical evidence

that confirms the severity of the alleged pain arising from that condition or (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain." *Id*. at 1560 (citing *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991)). If the Commissioner discredits the claimant's subjective testimony, she "must articulate explicit and adequate reasons for doing so." *Id*. at 1561-62.

In this case, the ALJ found that Daniel did not have nonexertional impairments. With respect to limitations arising from pain, the ALJ articulated specific reasons for finding Daniel's testimony about his limitations to be less than credible. These reasons were Daniel's activities of daily living, the lack of ongoing physical therapy or a pain management specialist and the conclusion that "recent physical examinations have revealed no serious physical deficits." R. 18.

It is unclear what the ALJ meant by his statement that Daniel had no serious physical deficits. The record is replete with medical evidence that Daniel had chronic pancreatitis. Physicians credited Daniel's complaints of pain, as reflected by the repeated prescriptions for strong pain medication. That Daniel had not been referred to a pain management specialist is consistent with his testimony that he did not have the funds for private treatment, his use of emergency rooms when seeking treatment, and the financial status that qualifies him under SSI. Finally, Daniel's minimal activities of daily living are not consistent with a finding that Daniel could perform sustained work activity. Accordingly, the cited reasons are not adequate based on the record in the case to discount Daniel's testimony about the functional limitations arising from his pain.

Accordingly, remand is required to permit the Commissioner properly to evaluate the functional limitations, if any, arising from the pain Daniel suffers. If the Commissioner determines that Daniel has nonexertional limitations on his ability to work, she should elicit testimony from a VE at step five of the evaluation process to determine whether there is work available that Daniel can perform. *See Phillips v. Barnhart*, 357 F.3d 1232, 1243 (11th Cir. 2004).

 B. *Award of Benefits or Remand*.

Daniel requests that the Court order the Commissioner to pay him disability benefits. A court may order an award of benefits "where the [Commissioner] has already considered the essential evidence and it is clear that the cumulative effect of the evidence establishes disability without any doubt." *Davis v. Shalala*, 985 F.2d 528, 534 (11th Cir. 1993); *accord Lewis v. Callahan*, 125 F.3d 1436, 1441 (11th Cir. 1997). Here, the record does not establish disability without any doubt. Rather, remand is required to permit the Commissioner to assess the functional limitations arising from Daniel's pain.

**VI.   CONCLUSION.**

For the reasons set forth herein, it is **ORDERED** that the decision of the Commissioner is **REVERSED** and the case is **REMANDED** under sentence four of 42 U.S.C. § 405(g) for further proceedings. The Clerk of Court is directed to issue a judgment consistent with this Order and, thereafter, to close the file.

**DONE** and **ORDERED** in Orlando, Florida on October 13, 2006.

*Karla R. Spaulding*
KARLA R. SPAULDING
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Parties